UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

THE BANK OF NEW YORK MELLON TRUST   :
COMPANY, NATIONAL ASSOCIATION, as
Trustee,   :

           Plaintiff,   :       09 Civ. 9415 (AJP)

      -against-   :       **OPINION AND ORDER**

SOLSTICE ABS CBO II, LTD., SOLSTICE ABS   :
CBO II INC., NATIXIS FINANCIAL PRODUCTS
INC. (f/k/a CDC FINANCIAL PRODUCTS INC.),   :
MBIA INSURANCE INC., et al.,
  :
      Defendants.
  :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**ANDREW J. PECK, United States Magistrate Judge:**

Presently before the Court is: (1) an inquest as to the proper amount of the Termination Payment as of the Early Termination Date of November 9, 2009, including whether the Termination Payment is a payment to or due from interpleader defendant Natixis Financial Products LLC, and (2) interpleader defendant MBIA Insurance Corporation's motion in limine to exclude from consideration on the inquest the testimony of Natixis' expert Michael DiYanni. (Dkt. No. 96: Notice of Motion.) The parties have consented to my decision of these issues on a dispositive basis pursuant to 28 U.S.C. § 636(c). (Dkt. No. 89.) For the reasons set forth below, the Court finds that a Termination Payment of $10,538,773 is due from Natixis.

**FACTS AND PROCEDURAL HISTORY**

The underlying facts of this case are set forth in Judge Batts' decision on the summary judgment motions. (Dkt. No. 84: 3/28/12 Order.) The facts and procedural history relevant to the inquest are summarized below.

In May 2002, Solstice ABS CBO II, Ltd. ("Issuer") completed a collateralized debt obligation ("CDO") transaction ("Transaction"), governed by the Indenture. (3/28/12 Order at 1.) At the closing of the Transaction, the Issuer issued secured Class A-1 Notes, Class A-2 Notes (together with the Class A-1 Notes, "Class A Notes"), Class B Notes and Class C Notes, as well as two classes of equity securities. (3/28/12 Order at 2.) The holders of the secured notes "made loans to the Issuer for the face amount of the Notes in exchange for the Issuer's promise" to pay the principal at their maturity in 2038, in addition to periodic interest payments. (3/28/12 Order at 2.) The Issuer used the proceeds to acquire an asset portfolio of debt instruments ("Asset Portfolio"). (3/28/12 Order at 2.) As trustee, The Bank of New York Mellon Trust Company ("Trustee") is required to collect the proceeds from the Asset Portfolio and distribute them on the biannual payment dates in accordance with the Priority of Payments provision in Indenture § 11.1(a). (3/28/12 Order at 2-3; see Dkt. No. 97: Biron 7/2/12 Aff. Ex. 2: Indenture § 11.1(a).)

At the closing of the Transaction, the Issuer also entered into the Cashflow Swap Agreement ("CSA") with Natixis. (3/28/12 Order at 2-3.) The CSA consists of three integrated documents: the ISDA Master Agreement ("Master Agreement"), a Schedule thereto, and a Confirmation. (3/28/12 Order at 4; see generally Biron 7/2/12 Aff. Ex. 6: Confirmation; Dkt. No. 100: Dugan 7/30/12 Aff. Ex. 4: Master Agmt.; Dugan 7/30/12 Aff. Ex. 5: Schedule.) The Master

Agreement is a commonly used standardized contract for swap transactions. (See Dugan 7/30/12 Aff. Ex. 4: Master Agmt.; Biron 7/2/12 Aff. Ex. 6: Confirmation: "This Confirmation is subject to the 2000 ISDA Definitions as published by the International Swaps and Derivatives Association, Inc. . . .") The Schedule sets forth amendments to the Master Agreement reflecting terms specifically negotiated by the parties. (See Dugan 7/30/12 Aff. Ex. 5: Schedule.) The Confirmation sets forth the transaction-specific terms of the CSA, detailing the payment obligations of the Issuer and Natixis. (3/28/12 Order at 7; see Biron 7/2/12 Aff. Ex. 6: Confirmation.) Under the CSA, Natixis agreed to advance funds to the Issuer necessary to make interest payments due to the holders of Class A and B Notes on each Distribution Date when the Interest and Principal Proceeds were insufficient to make those payments. (3/28/12 Order at 4.) The Issuer agreed to pay Natixis a biannual fee of 0.065%[1] multiplied by the outstanding amount of the Class A and B Notes ("CSA Fee") and to reimburse Natixis for any payments plus interest, "'provided . . . that Interest Proceeds or Principal Proceeds are available in accordance with the Priority of Payments to make such distributions on such Distribution Date.'" (3/28/12 Order at 4-5; Biron 7/2/12 Aff. Ex. 6: Confirmation at 2-5.) Natixis collected $2 million in fees during the CSA's first six years and made its first advance in November 2008. (Biron 7/2/12 Aff. Ex. 9: Natixis 56.1 Counter Stmt. ¶ 29; Dugan 7/30/12 Aff. Ex. 8: MBIA 56.1 Counter Stmt. ¶¶ 45-46.)

At the close of the Transaction, MBIA sold credit protection to the Class A-1 Note holders and agreed to purchase the Class A-1 Notes if the Issuer failed to make required payments.

---

[1] A "basis point" equals 0.01%. See Richard A. Brealey, Stewart C. Meyers & Franklin Allen, Principles of Corporate Finance G-1 (10th ed. 2011). Thus, 0.065% is equal to 6.5 basis points ("bps").

(3/28/12 Order at 3.) Pursuant to the swap transaction, MBIA was paid a fee of 0.085% per annum multiplied by the outstanding amount of the Class A-1 Notes ("MBIA Swap Fee") for agreeing to purchase the Class A-1 Notes if there was a payment default. (Dkt. No. 115: Sogol 12/3/12 Aff. Ex. 7: MBIA Confirmation at 2-3.) Through November 2009, MBIA received approximately $1.1 million in fees under the MBIA Swap. (Dkt. No. 115: Sloan Aff. ¶ 2.)

        In October 2009, a § 5.1(j) Event of Default ("EOD") occurred because the "'Class A Overcollateralization Ratio on a Measurement Date was less than 101%,'" and on October 26, 2009, the Trustee issued a "Notice of Event of Default," as required under Indenture § 6.2. (3/28/12 Order at 5; see Biron 7/2/12 Aff. Ex. 2: Indenture §§ 5.1(j), 6.2.)[2/] The EOD pursuant to Indenture § 5.1(j) constituted a "'Cashflow Swap Cancellation Event'" under the Confirmation and an "'Additional Termination Event'" under the Schedule. (3/28/12 Order at 5, 7; see Biron 7/2/12 Aff. Ex. 6: Confirmation at 5; Dugan 7/30/12 Aff. Ex. 5: Schedule Part I(j)(2)(c).) A Cashflow Swap Cancellation Event means "'that an Indenture Default under Section 5.1(a) . . . or (j) of the Indenture has occurred and is continuing'" on the determination date. (3/28/12 Order at 7; see Biron 7/2/12 Aff. Ex. 6: Confirmation at 5.) The Master Agreement provides that when an Additional Termination Event occurs, Natixis "'may, by not more than 20 days notice to the other party and

---

[2/]      Indenture § 6.2 provides:

> Promptly (and in no event later than two Business Days) after the occurrence of any Default . . . , the Trustee shall mail to . . . the Class A-1 Note controlling party . . . [and] the Cashflow Swap Counterparty . . . notice of all Defaults hereunder known to the Trustee, unless such Default shall have been cured or waived.

(Biron 7/2/12 Aff. Ex. 2: Indenture § 6.2.)

provided that the relevant Termination Event is then continuing, designate a day not earlier than the day such notice is effective as an Early Termination Date.'" (3/28/12 Order at 5; see Dugan 7/30/12 Aff. Ex. 4: Master Agmt. § 6(b)(iv).)

On November 4, 2009, Natixis issued an Early Termination Notice stating that an EOD constituted an Additional Termination Event under Part 1(j)(2)(c) of the Schedule, designating November 9, 2009 as the Early Termination Date pursuant to Master Agreement § 6(b)(iv), and claiming that the Issuer owed it a Termination Payment of $2.2 million. (3/28/12 Order at 5-6; see Dugan 7/30/12 Aff. Ex. 4: Master Agmt. § 6(b)(iv); Dugan 7/30/12 Aff. Ex. 5: Schedule Part 1(j)(2)(c).)

On November 6, 2009, MBIA waived the EOD under Indenture § 5.1(j). (3/28/12 Order at 6.)[3/] On November 8, 2009, MBIA issued a letter to the Trustee claiming that because of its waiver, "'all effects of the Event of Default were rendered nullities . . . and MBIA must be restored to its former position as beneficiary of the Cashflow Swap.'" (3/28/12 Order at 6.)[4/]

---

[3/] Pursuant to Indenture § 5.14, MBIA, as a "'Majority of the Controlling Class,'" is permitted to waive a "'Default'" and its consequences, except as detailed in Indenture § 5.14(a)-(c). (3/28/12 Order at 4; see Biron 7/2/12 Aff. Ex. 2: Indenture § 5.14.)

[4/] The Master Agreement provides that:

> "[u]pon the occurrence or effective designation of an Early Termination Date, no further payments or deliveries . . . in respect of the Terminated Transactions will be required to be made, but without prejudice to the other provisions of this Agreement. The amount, if any, payable in respect of an Early Termination Date shall be determined pursuant to Section 6(e)."

(3/28/12 Order at 6-7, quoting Dugan 7/30/12 Aff. Ex. 4: Master Agmt. § 6(c)(ii).) If "'a Cashflow Swap Cancellation Event has occurred and is continuing,' the amount of Natixis' (continued...)

On November 9, 2009, a Distribution Date, the Issuer had insufficient funds to pay interest payments on the Class A and B Notes.  (Dkt. No. 115: MBIA Supp. Opp. Br. at 9-10; Sogol 12/3/12 Aff. Ex. 17: 11/9/19 Note Valuation Report.)  Because the Issuer did not pay the interest due on Class A and B Notes, MBIA was required to purchase the Class A-1 Notes for their outstanding face amount, approximately $82.8 million.  (Dugan 11/19/12 Aff. Ex. 15: 11/25/09 Credit Event Notice; MBIA Supp. Opp. Br. at 10; Sogol 12/3/12 Aff. Ex. 13: North Dep. at 214-15; Sogol 12/3/12 Aff. Ex. 18: 11/9/09 Email.)  MBIA now holds the Class A-1 Notes and is a third party beneficiary of the CSA.  (3/28/12 Order at 3-5, 10.)

On November 12, 2009, the Trustee commenced this interpleader action, and in March 2011, various parties cross-moved for summary judgment.  (3/28/12 Order at 1-2.)  Judge Batts held that the Cashflow Swap terminated on November 9, 2009 but that Natixis' proposed Termination Payment of $2.2 million from MBIA to Natixis was not proper.  (3/28/12 Order at 16, 21-22.)

Specifically, Judge Batts held that:

[T]here can be no dispute that MBIA's waiver of the Event of Default did not render Natixis' designation of an Early Termination Date a nullity.  Section 6(c)(i) of the ISDA Master Agreement unambiguously provides that once an Early Termination Date has been designated, "the Early Termination Date will occur on the date so designated whether or not the relevant Event of Default or Termination Event is then continuing."

(3/28/12 Order at 12.)

---

[4/]    (...continued)
required payment to the Issuer on that date is zero."  (3/28/12 Order at 7, quoting Biron 7/2/12 Aff. Ex. 6: Confirmation at 2.)

With respect to Natixis' Termination Payment calculation, Judge Batts held:

Natixis failed to take into account MBIA's waiver of the Event of Default under the Indenture, which cured the Cashflow Swap Cancellation Event and reinstated Natixis' obligation to make payments under the Cashflow Swap Agreement, as specifically set out in the Confirmation. The Cashflow Swap Agreement unambiguously provides that Natixis was required to estimate the future value of those obligations when calculating the Termination Payment.

Section 6(e) of the ISDA Master Agreement governs payments due upon early termination of the Cashflow Swap Agreement. Section 6(e) provides, "[i]f an Early Termination Date occurs, the following provisions shall apply based on the parties' election in the Schedule of a payment measure, either 'Market Quotation' or the 'Loss', and a payment method, either the 'First Method' or the 'Second Method'." According to the Schedule, Natixis and the Issuer agreed that "Market Quotation" and the "Second Method" would apply.

Under the Market Quotation measure, a party, here Natixis, was required to determine, based on quotations from Reference Market-makers,

"an amount, if any, that would be paid to such party . . . or by such party . . . in consideration of an agreement . . . to enter into a transaction (the 'Replacement Transaction') that would have the effect of preserving for such party the economic equivalent of any payment or delivery (whether the underlying obligation was absolute or contingent and assuming the satisfaction of each applicable condition precedent) by the parties under Section 2(a)(i) . . . that would, but for the relevant Early Termination Date, have been required after that date."

Where a party is unable to obtain the necessary quotations from Reference Market-makers, the "Loss" computation applies instead. Under the definition of Loss, the party must determine "an amount that party reasonably determines in good faith to be its total losses and costs (or gain, in which case expressed as a negative number) . . . including any loss of bargain . . . ."

It is undisputed that Natixis, purportedly using the "Loss" measure, claims it is owed a $2.2 million Termination Payment. The $2.2 million figure included unreimbursed amounts that Natixis had previously advanced under the Cash Flow Swap, along with interest, fees, and expenses. The $2.2 million figure did not include any discounted cash flow analysis of payments likely due to or from Natixis after the Early Termination Date.

(3/28/12 Order at 13-15, citations omitted.)

> Judge Batts further explained how to calculate the Termination Payment:
>
> [W]hen calculating the "economic equivalent" of payments required after the Termination Date, Natixis was required to assume satisfaction of the condition precedent that no Early Termination Date had been effectively designated, and that the obligations between Natixis and the Issuer would continue as set forth in the Confirmation. Similarly, the definition of "Loss" requires calculation of both losses and gains, including from "loss of bargain." The ISDA Master Agreement thus specifically requires inclusion of future, contingent obligations when calculating the required Early Termination Payment.
>
> On the Early Termination Date, November 9, 2009, MBIA had waived the Event of Default under the Indenture. Accordingly, no Cashflow Swap Cancellation Event was continuing on that date, and Natixis' obligation under the Confirmation of the Cashflow Swap Agreement to make payments to cover the interest shortfalls on the Class A and B Notes was in force. Natixis was therefore required to take this obligation into account when calculating the Termination Payment.

(3/28/12 Order at 17, citation omitted.) Judge Batts clarified that "[t]here can simply be no question that Natixis was required to account for the value of the Cash Flow Swap through its scheduled end, but failed to do so." (3/28/12 Order at 17-18 n.3.)

Judge Batts referred the matter to me for an inquest as to the proper amount of the Termination Payment as of the Early Termination Date of November 9, 2009, including whether the Termination Payment should have resulted in a payment to or a payment due from Natixis. (3/28/12 Order at 21-22; Dkt. No. 85: Referral Order.) The parties consented,

> pursuant to 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73, that a United States Magistrate Judge conduct proceedings in this action regarding the inquest as to the proper amount of the Termination Payment as of the Early Termination Date of November 9, 2009, in accordance with District Judge Batts March 28, 2012 Order.

(Dkt. No. 89: § 636(c) Consent.)

After the motion was fully briefed, the Court requested supplemental briefing and scheduled oral argument "to aid the Court in understanding the transactions at issue, specifically the factual basis for the assumptions used by Natixis' expert Michael DiYanni and MBIA's expert Dr. Peter Niculescu to calculate the Early Termination Payment." (Dkt. No. 112: 11/9/12 Order; see also 11/20/12 Conf. Tr.; Natixis Supp. Letter Br.; MBIA Supp. Opp. Br.; Dkt. No. 116: Natixis Supp. Reply Br.)

**Natixis' Expert:  Michael DiYanni**

Michael DiYanni is a Senior Vice President at Moelis & Company, an investment banking firm. (Dkt. No. 97: Biron 7/2/12 Aff. Ex. 8: DiYanni Report at 4 & App'x 10: DiYanni CV.) DiYanni has an M.S. in Finance and Economics from the London School of Economics and a B.A. in Economics from Yale University. (DiYanni Report at 4-5 & App'x 10: DiYanni CV.) DiYanni's professional experience in this area began in 2001, and he has "structured, traded, and advised clients on a wide variety of securitization and fixed income instruments" including "synthetic CDOs, single name and portfolio credit derivatives, financial guarantee insurance products, interest rate swaps, repackagings, and SPV issued notes." (DiYanni Report at 4-6.) While working at J.P. Morgan and Citigroup, "DiYanni structured synthetic RMBS [Residential Mortgage-Backed Securities] transactions, priced RMBS, and supervised the determination of assumptions used to determine the cash flows from RMBS." (Dkt. No. 100: Natixis Opp. Br. at 28; see Dkt. No. 100: DiYanni Aff. ¶¶ 5-6; Biron 7/2/12 Aff. Ex. 10: DiYanni Dep. at 90-92, 97.) DiYanni has advised a client "'on substantially all of [the client's] credit default swap portfolio,' which included RMBS." (Natixis Opp. Br. at 28; DiYanni Aff. ¶ 6; Biron 7/2/12 Aff. Ex. 10: DiYanni Dep. at 90.)

In general, DiYanni calculated the Termination Payment as of November 9, 2009, used "a discount rate of LIBOR + 200bps," and assumed that "the 'Hedge Agreement' between Solstice and Rabobank had not been terminated for the purpose of the Termination Payment calculation." (DiYanni Report at 15, 18.) DiYanni set forth three Termination Payment calculations based on different assumptions. (DiYanni Report at 11-14.)

In Model A, DiYanni assumed "the satisfaction of conditions precedent to the payment obligations of each of Natixis and Solstice, and that the future payment obligations of both parties . . . [were] met," i.e., that the Issuer would be obligated to make payments to Natixis on certain future Distribution Dates even if the Interest and Principal Proceeds were not available to do so under the Priority of Payments. (DiYanni Report at 11-12, 19-21.) DiYanni opined that:

> Based on my experience as a market practitioner, the calculation of Termination Payments is based upon all obligations (whether contingent or otherwise) owed by each counterparty to the other, not on each counterparty's projected ability to actually fulfill its payment obligations in the future. To put it in layman's terms, my experience is (and has consistently been) that the calculation of Termination Payments for derivatives transactions is based upon present valuing (with respect to the obligations of both parties to a derivatives transaction) a projection of what each party "should" pay under the agreement, not what each party "would" actually be able to pay.

(DiYanni Report at 21-22.) DiYanni further assumed that the CSA would end in May 2018, when Solstice would have no substantive cash-flowing assets with which to repay any further advances, interest, or fees. (DiYanni Report at 38-43.) DiYanni's Model A calculated a Termination Payment of $2,543,335 due to Natixis from the Issuer. (DiYanni Report at 11-12, 31.) DiYanni opined that Model A "is an appropriate model to use to determine the proper amount of the Termination Payment." (DiYanni Report at 8.)

In Model B, DiYanni assumed:

> that the October 26, 2009 Event of Default . . . under the Indenture that resulted in a Cashflow Swap Cancellation Event and was waived as of November 9, 2009 by MBIA under the Indenture, but that future events of default, which had occurred and were continuing as of November 9, 2009 (the payment date for the Solstice Notes . . . ), were not waived.

(DiYanni Report at 12-13, 32.)  The additional EOD "result in a new Cashflow Swap Cancellation Event as early as November 2, 2009 and the suspension of all of Natixis' future payment obligations as of that date."  (DiYanni Report at 12.)  DiYanni's Model B calculated a Termination Payment of $2,950,570 due to Natixis from the Issuer.  (DiYanni Supp. Report at 2.)[5]

In Model C, which DiYanni calls the "'Niculescu Approach,'" DiYanni assumed the same cashflow projections as Model A but also assumed that "Solstice's projected inability to fulfill its future payment obligations [was] a factor in the calculation of the Termination Payment." (DiYanni Report at 13, 37-58.)  DiYanni opined, however, that this further assumption was not consistent "with market practice for closing out derivatives transactions."  (DiYanni Report at 13.) Contrary to Model A, Model C "is performed assuming [DiYanni's] projection of what Solstice would pay, based on Solstice's available future funds (as opposed to what Solstice should pay, contingent or otherwise, as in Model A)."  (DiYanni Report at 37.)  DiYanni's opinion is that "this approach runs contrary to [his] commercial understanding of the language in the ISDA Master Agreement."  (DiYanni Report at 37.)  DiYanni valued the CSA through May 2018 (when the last

---

[5]    DiYanni originally valued Model B through May 2038, calculating a Termination Payment of $3,634,154 due to Natixis.  (DiYanni Report at 13, 35.)  During oral argument, the Court suggested that DiYanni should provide an alternative Model B calculation valued through 2018 or 2020.  (11/20/12 Conf. Tr. at 35.)

meaningful reimbursement payment from Solstice would be received) and alternatively through May 2020 (when the remaining principal payments to be received by the Issuer would be less than $1 million). (DiYanni Report at 38-39.) DiYanni's Model C calculated a Termination Payment due from Natixis to the Issuer of $2,259,785 and $10,538,773 when valued through May 2018 and May 2020, respectively. (DiYanni Report at 39-40, 59-61 & App'x 1, 4.)

**MBIA's Expert:  Dr. Peter Niculescu**

Dr. Peter Niculescu is a Partner at Capital Market Risk Advisors ("CMRA"), a risk management firm, where he heads Fixed Income Advisory. (Dkt. No. 97: Biron 7/2/12 Aff. Ex. 3: Niculescu Am. Report at 2 & App'x G: Niculescu CV.) Dr. Niculescu has a Ph.D. in Economics from Yale University. (Niculescu Am. Report at 2 & App'x G: Niculescu CV.) Prior to joining CMRA, Dr. Niculescu was an Executive Vice President and head of Capital Markets at Fannie Mae from 1999 to 2008. (Niculescu Am. Report App'x G: Niculescu CV.) From 1990 to 1999, Dr. Niculescu worked at Goldman Sachs; from 1993 to 1998, he lead the Mortgage Research group. (Niculescu Am. Report App'x G: Niculescu CV.)

Dr. Niculescu was "instructed to assume and [has] assumed that the claim will end when the principal balance outstanding of non-defaulted and currently paying securities reaches a $1 million threshold[, which] is projected to happen in November, 2023." (Biron 7/2/12 Aff. Ex. 4: Niculescu Supp. Report at 2.) In his Amended Expert Report, Dr. Niculescu opined:

> I am of the opinion that, should the Cashflow Swap stay in operation through the life of the Transaction, Natixis would be called upon to make significant unreimbursed payments to the Issuer beginning in May 2015. Those payments are projected to total $43.6 million by November 2023, at which time the projections show that the Issuer would have no underlying assets and therefore no possible further interest or principal collections*. The present value of the payments projected to be made to

the Issuer under the Cashflow Swap through 2023 varies from $13.0 to $22.2 million depending on the discount rate assumption used.

* As noted below, it is also possible that further payments could be required from the Cashflow Swap until the legal final maturity of Solstice II in 2038 and that such sums could be in excess of $100 million.

(Niculescu Am. Report at 5, fn. in original.)

Dr. Niculescu also submitted a Reply Report to DiYanni's Report in which Dr. Niculescu adopted DiYanni's discount rate of LIBOR +200 bps. (Biron 7/2/12 Aff. Ex. 5: Niculescu Reply Report at 3.) Dr. Niculescu used two end dates in his calculations: "November 9, 2023 (when, based on [his] cash-flow projections, [he] estimate[d] that the principal balance outstanding on non-defaulted and currently paying securities in the Solstice II collateral pool is less than $1 million) and May 9, 2038 (the Scheduled Maturity of the Class A Notes)." (Niculescu Reply Report at 12-13.) Using a discount rate of LIBOR +200 bps, Dr. Niculescu calculated that the Termination Payment would be $18,976,084 or $46,615,103 due to the Issuer from Natixis with end dates of November 2023 or May 2038, respectively. (Niculescu Reply Report at 4.)[6]

**ANALYSIS**[7]

---

[6] In performing his calculations, Dr. Niculescu was instructed to assume "that those hedging swaps [with Rabobank] terminated in November 2009 and Rabobank was entitled to a termination payment of approximately $20 million." (Niculescu Reply Report at 4.) If he assumed that the Hedge Agreement with Rabobank had not terminated, Dr. Niculescu calculated that the Termination Payment would be $19,187,364 or $47,059,041 due to the Issuer from Natixis with end dates of November 9, 2023 or May 9, 2038, respectively. (Niculescu Reply Report at 4.)

[7] The Second Circuit has approved the holding of an inquest by affidavit, without an in-person court hearing, "'as long as [the Court has] ensured that there was a basis for the damages specified in the default judgment.'" Transatlantic Marine Claims Agency, Inc. v. Ace (continued...)

## I.     APPLICABLE LEGAL STANDARDS

### A.     Applicable Legal Standards for Expert Testimony

"[T]he proponent of expert testimony has the burden of establishing by a preponderance of the evidence that the admissibility requirements of Rule 702 are satisfied . . . ." United States v. Williams, 506 F.3d 151, 160 (2d Cir. 2007) (citing Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579, 593 n.10, 113 S. Ct. 2786, 2796 n.10 (1993)), cert. denied, 552 U.S. 1223, 1224, 1290, 128 S. Ct. 1329, 1330, 1727 (2008).[8/] Federal Rule of Evidence 702 provides that:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> > (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> >
> > (b) the testimony is based on sufficient facts or data;
> >
> > (c) the testimony is the product of reliable principles and methods; and
> >
> > (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.

---

[7/]     (...continued)
Shipping Corp., 109 F.3d 105, 111 (2d Cir. 1997) (quoting Fustok v. ContiCommodity Servs., Inc., 873 F.2d 38, 40 (2d Cir. 1989)). In addition, the Court held oral argument and accepted supplemental affidavits and briefs from the parties and their experts in connection with that hearing.

[8/]     Accord, e.g., Floyd v. City of N.Y., 861 F. Supp. 2d 274, 285 (S.D.N.Y. 2012); Liberty Media Corp. v. Vivendi Universal, S.A., 03 Civ. 2175, --- F. Supp. 2d ----, 2012 WL 1097351 at *1 (S.D.N.Y. Apr. 2, 2012); Medisim Ltd. v. BestMed LLC, 861 F. Supp. 2d 158, 164 (S.D.N.Y. 2012); Wolk v. Kodak Imaging Network, Inc., 840 F. Supp. 2d 724, 739 (S.D.N.Y. 2012).

"The trial court acts as a gatekeeper with respect to expert testimony, properly admitting only such testimony as would help the jury understand the evidence or determine a fact at issue." Hickey v. City of N.Y., 173 F. App'x 893, 894 (2d Cir. 2006) (citing Daubert v. Merrell Dow Pharm., Inc., 509 U.S. at 592-93, 113 S. Ct. at 2796-97).[9/] Where the judge is the trier of fact, "the Court has 'greater flexibility in satisfying its gatekeeping function vis a vis expert testimony . . . given the absence of the need to protect juries from dubious expert evidence.'" Prudential Ret. Ins. & Annuity Co. v. State St. Bank & Trust Co. (In re State St. Bank & Trust Co. Fixed Income Funds Inv. Litig.), 772 F. Supp. 2d 519, 563 (S.D.N.Y. 2011).[10/]

"In evaluating the admissibility of expert testimony, [the Second Circuit] requires the exclusion of testimony which states a legal conclusion." United States v. Duncan, 42 F.3d 97, 101 (2d Cir. 1994).[11/]

---

[9/]    See also, e.g., MLB Props., Inc. v. Salvino, Inc., 542 F.3d 290, 311 (2d Cir. 2008); Bickerstaff v. Vassar Coll., 196 F.3d 435, 449 (2d Cir. 1999), cert. denied, 530 U.S. 1242, 120 S. Ct. 2688 (2000); Raskin v. Wyatt Co., 125 F.3d 55, 66 (2d Cir. 1997); Buckley v. Deloitte & Touche USA LLP, 06 Civ. 3291, --- F. Supp. 2d ----, 2012 WL 3538733 at *6 (S.D.N.Y. Aug. 16, 2012); Floyd v. City of N.Y., 861 F. Supp. 2d at 286.

[10/]   See, e.g., Louis Vuitton Malletier v. Dooney & Bourke, Inc., 525 F. Supp. 2d 558, 629 (S.D.N.Y. 2007) ("It is well-established that the Daubert gatekeeping standard is applied more flexibly when the judge is the factfinder, and accordingly more rigorously when the expert testimony is to be presented to a jury."); Chitayat v. Vanderbilt Assocs., No. 03-5314, 2007 WL 2890248 at *2 (E.D.N.Y. Sept. 27, 2007) (A "court has greater flexibility in satisfying its gatekeeping function vis a vis expert testimony where it is the trier of fact given the absence of the need to protect juries from dubious expert evidence."); Am. Home Assurance Co. v. Masters' Ships Mgmt. S.A., 03 Civ. 0618, 2005 WL 159592 at *1 (S.D.N.Y. Jan. 25, 2005) ("As this will be a bench trial, there is no concern with protecting a jury from 'being bamboozled by technical evidence of dubious merit.'").

[11/]   Accord, e.g., Donellan v. Ferag, Inc., 26 F. App'x 72, 75 (2d Cir. 2002); United States v. Feliciano, 223 F.3d 102, 121 (2d Cir. 2000), cert. denied, 532 U.S. 943, 121 S. Ct. 1405,
(continued...)

"The objective of [Daubert's gatekeeping] requirement is to ensure the reliability and relevancy of expert testimony." Kumho Tire Co. v. Carmichael, 526 U.S. 137, 152, 119 S. Ct. 1167, 1176 (1999).[12/]

With respect to reliability, the Court must decide "whether this particular expert [has] sufficient specialized knowledge to assist the [trier of fact] 'in deciding the particular issues in the case.'" Kumho Tire Co. v. Carmichael, 526 U.S. at 156, 119 S. Ct. at 1178.[13/] While expert witnesses are "permitted wide latitude to offer opinions, including those that are not based on firsthand knowledge or observation," Daubert v. Merrell Dow Pharm., Inc., 509 U.S. at 592, 113 S. Ct. at 2796,[14/] "an expert's opinion must be based upon his own application of principles within his expertise to the facts of the case." Quiles v. Bradford-White Corp., No. 10-CV-747, 2012 WL 1355262 at *7 (N.D.N.Y. Apr. 18, 2012). "An expert cannot simply parrot the findings of another

---

[11/]    (...continued)
1406 (2001); see also, e.g., Muller-Paisner v. TIAA, 03 Civ. 6265, --- F. Supp. 2d ----, 2012 WL 3205583 at *8 (S.D.N.Y. Aug. 9, 2012); United States ex rel. Anti-Discrimination Ctr. of Metro N.Y., Inc. v. Westchester Cnty., 06 Civ. 2860, 2009 WL 1110577 at *2 (S.D.N.Y. Apr. 22, 2009).

[12/]    See, e.g., Daubert v. Merrell Dow Pharm., Inc., 509 U.S. at 597, 113 S. Ct. at 2799 (The trial court must ensure "that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand."); United States v. Barnes, 411 F. App'x 365, 370 (2d Cir.), cert. denied, 131 S. Ct. 2915 (2011); Moltner v. Starbucks Coffee Co., 399 F. App'x 630, 631 (2d Cir. 2010); United States v. Williams, 506 F.3d at 160.

[13/]    Accord, e.g., Hutton v. Globe Hoist Co., 158 F. Supp. 2d 371, 375-76 (S.D.N.Y. 2001); Gray v. Briggs, 45 F. Supp. 2d 316, 323 (S.D.N.Y. 1999); Grdinich v. Bradlees, 187 F.R.D. 77, 81 (S.D.N.Y. 1999).

[14/]    Accord, e.g., MLB Props., Inc. v. Salvino, Inc., 542 F.3d at 310; see also e.g., Buckley v. Deloitte & Touche USA LLP, 2012 WL 3538733 at *6; Teva Pharm. USA, Inc. v. Sandoz, Inc., 749 F. Supp. 2d 130, 131 (S.D.N.Y. 2010).

arrived at in another context." <u>Quiles</u> v. <u>Bradford-White Corp.</u>, 2012 WL 1355262 at *7.[15] "Where the record indicates that the expert failed to consider necessary factors or that his analysis rests on faulty assumptions, the trial court has discretion to exclude his proffered testimony for lack of probative value." <u>Lightfoot</u> v. <u>Union Carbide Corp.</u>, No. 98-7166, 175 F.3d 1008 (table), 1999 WL 110424 at *2 (2d Cir. Mar. 1, 1999), <u>cert. denied</u>, 528 U.S. 817, 120 S. Ct. 56 (1999).[16] "[O]ther contentions that the assumptions are unfounded 'go to the weight, not the admissibility, of the testimony.'" <u>Boucher</u> v. <u>U.S. Suzuki Motor Corp.</u>, 73 F.3d at 21.[17]

With respect to relevance, "Rule 702 further requires that the evidence or testimony 'assist the trier of fact to understand the evidence or to determine a fact in issue.' This condition goes

---

[15]     <u>See</u>, <u>e.g.</u>, <u>Louis Vuitton Malletier</u> v. <u>Dooney & Bourke, Inc.</u>, 525 F. Supp. 2d at 664 (In rendering an opinion, "the expert witness must in the end be giving his <u>own</u> opinion. He cannot simply be a conduit for the opinion of an unproduced expert.").

[16]     <u>See</u>, <u>e.g.</u>, <u>Boucher</u> v. <u>U.S. Suzuki Motor Corp.</u>, 73 F.3d 18, 21 (2d Cir. 1996) ("Admission of expert testimony based on speculative assumptions is an abuse of discretion."); <u>MLB Props., Inc.</u> v. <u>Salvino, Inc.</u>, 542 F.3d at 311; <u>Buckley</u> v. <u>Deloitte & Touche USA LLP</u>, 2012 WL 3538733 at *7 ("The [expert] opinion relies on unfounded assumptions about what [plaintiff] and lenders would have done if certain hypothetical events took place. Even though [the expert] appears qualified by his experience to opine on restructuring issues, his report must be excluded for lack of sufficient factual foundation and for want of reliable methodology."); <u>Astra Aktiebolag</u> v. <u>Andrx Pharm., Inc.</u>, 222 F. Supp. 2d 423, 488 (S.D.N.Y. 2002), <u>aff'd</u>, 84 F. App'x 76 (2003); <u>Supply & Bldg. Co.</u> v. <u>Estee Lauder Int'l, Inc.</u>, 95 Civ. 8136, 2001 WL 1602976 at *4 (S.D.N.Y. Dec. 14, 2001) (Expert "testimony based on assumptions that are so unrealistic and contradictory as to suggest bad faith, or to be in essence an apples and oranges comparison, will not be admitted." (quotations omitted)).

[17]     <u>Accord</u>, <u>e.g.</u>, <u>Sinkov</u> v. <u>Americor, Inc.</u>, 419 F. App'x 86, 90 (2d Cir. 2011); <u>Zerega Ave. Realty Corp.</u> v. <u>Hornbeck Offshore Transp., LLC</u>, 571 F.3d 206, 214 (2d Cir. 2009); <u>Lagano</u> v. <u>Chrysler Corp.</u>, Nos. 97-7695, 97-7727, 141 F.3d 115 (table), 1998 WL 74850 at *3 (2d Cir. Feb. 19, 1998) ("Lesser flaws in the expert's assumptions affect the weight to be given to his testimony, not its admissibility."); <u>Tyler</u> v. <u>Bethlehem Steel Corp.</u>, 958 F.2d 1176, 1188 (2d Cir.), <u>cert. denied</u>, 506 U.S. 826, 113 S. Ct. 82 (1992).

primarily to relevance. 'Expert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful.'" Daubert v. Merrell Dow Pharm., Inc., 509 U.S. at 591, 113 S. Ct. at 2795.[18]

"It is well-established that 'the trial judge has broad discretion in the matter of the admission or exclusion of expert evidence, and his action is to be sustained unless manifestly erroneous.'" Boucher v. U.S. Suzuki Motor Corp., 73 F.3d at 21 (quoting Salem v. U.S. Lines Co., 370 U.S. 31, 35, 82 S. Ct. 1119, 1122 (1962)).[19]

### B.    Applicable Legal Standards for Contract Law

The CSA is governed by New York law. (See Dkt. No. 100: Dugan 7/30/12 Aff. Ex. 5: Schedule at 9 ("Governing Law. This Agreement and each Confirmation shall be construed in accordance with, and this Agreement, each Confirmation and all matters arising out of or relating in any way whatsoever (whether in contract, tort or otherwise) to this Agreement or any Confirmation shall be governed by, the law of the State of New York.").)

"Under New York law 'the initial interpretation of a contract is a matter of law for the court to decide.' Included in this initial interpretation is the threshold question of whether the terms of the contract are ambiguous." Alexander & Alexander Servs., Inc. v. These Certain Underwriters at Lloyd's, 136 F.3d 82, 86 (2d Cir. 1998) (citations omitted); accord, e.g., W.W.W.

---

[18]    Accord, e.g., Island Intellectual Prop. LLC v. Deutsche Bank AG, 09 Civ. 2675, 2012 WL 526722 at *1 (S.D.N.Y. Feb. 14, 2012); Universe Antiques, Inc. v. Vareika, 10 Civ. 3629, 2011 WL 5117057 at *5 (S.D.N.Y. Oct. 21, 2011); CIT Grp./Bus. Credit, Inc. v. Graco Fishing & Rental Tools, Inc., 815 F. Supp. 2d 673, 676 (S.D.N.Y. 2011).

[19]    Accord, e.g., Yurman Design, Inc. v. PAJ, Inc., 29 F. App'x 46, 48 (2d Cir. 2002); Artista Records LLC v. Lime Grp. LLC, 06 Civ. 5936, 2011 WL 1674796 at *1 (S.D.N.Y. May 2, 2011); Papyrus Tech. Corp. v. N.Y. Stock Exch., LLC, 257 F.R.D. 39, 41 (S.D.N.Y. 2009).

Assocs., Inc. v. Giancontieri, 77 N.Y.2d 157, 162, 565 N.Y.S.2d 440, 443 (1990) ("Whether or not a writing is ambiguous is a question of law to be resolved by the courts."); Sutton v. E. River Sav. Bank, 55 N.Y.2d 550, 554, 450 N.Y.S.2d 460, 462 (1982) ("[T]he threshold decision on whether a writing is ambiguous is the exclusive province of the court.").[20/]

"It is axiomatic that where the language of a contract is unambiguous, the parties' intent is determined within the four corners of the contract, without reference to external evidence." Feifer v. Prudential Ins. Co. of Am., 306 F.3d 1202, 1210 (2d Cir. 2002); accord, e.g., Lockheed Martin Corp. v. Retail Holdings, N.V., 639 F.3d 63, 69 (2d Cir. 2011) ("Ambiguity is determined by looking within the four corners of the document, not to outside sources." (quotations omitted)); Rosenblatt v. Christie, Manson & Woods, Ltd., 195 F. App'x 11, 12 (2d Cir. 2006) ("Where, as here, a contract is unambiguous, it is enforced according to its terms, and the court will generally not look 'outside the four corners of the document' to add to or vary it."); Maniolos v. United States, 741 F. Supp. 2d at 566 (& cases cited therein).[21/]

_____

[20/]    See, e.g., Bayerische Landesbank v. Aladdin Capital Mgmt. LLC, 692 F.3d 42, 53 (2d Cir. 2012); Bison Capital Corp. v. ATP Oil & Gas Corp., 473 F. App'x 40, 41-42 (2d Cir. 2012); Law Debenture Trust Co. v. Maverick Tube Corp., 595 F.3d 458, 465 (2d Cir. 2010); JA Apparel Corp. v. Abboud, 568 F.3d 390, 396-97 (2d Cir. 2009); Am. Home Assurance Co. v. Hapag Lloyd Container Linie, GmbH, 446 F.3d 313, 316 (2d Cir. 2006); Augienello v. Coast-to-Coast Fin. Corp., 64 F. App'x 820, 821-22 (2d Cir. 2003); Maniolos v. United States, 741 F. Supp. 2d 555, 566 (S.D.N.Y. 2010) (Peck, M.J.) (& cases cited therein), aff'd, 468 F. App'x 56 (2d Cir. 2012).

[21/]    See, e.g., S. N.J. Rail Grp., LLC v. Lumbermens Mut. Ins. Co., 06 Civ. 4946, 2007 WL 2296506 at *7 & n.9 (S.D.N.Y. Aug. 13, 2007) (Peck, M.J.) (& cases cited therein); R/S Assocs. v. N.Y. Job Dev. Auth., 98 N.Y.2d 29, 33, 744 N.Y.S.2d 358, 360 (2002) ("Unless the court finds ambiguity, the rules governing the interpretation of ambiguous contracts do not come into play. Thus, when interpreting an unambiguous contract term [e]vidence outside the four corners of the document . . . is generally inadmissible to add to or vary the
(continued...)

"Contract language is not ambiguous if it has 'a definite and precise meaning . . . concerning which there is no reasonable basis for a difference of opinion.'" <u>Hunt Ltd.</u> v. <u>Lifschultz Fast Freight, Inc.</u>, 889 F.2d 1274, 1277 (2d Cir. 1989) (quoting <u>Breed</u> v. <u>Ins. Co. of N. Am.</u>, 46 N.Y.2d 351, 355, 413 N.Y.S.2d 352, 355 (1978)).[22/] Conversely, a contract is ambiguous if it is reasonably susceptible to more than one meaning. <u>E.g.</u>, <u>Chimart Assocs.</u> v. <u>Paul</u>, 66 N.Y.2d 570, 573, 498 N.Y.S.2d 344, 346 (1986) (to determine if ambiguity exists in contract court must determine "whether the agreement on its face is reasonably susceptible of more than one interpretation"); <u>Banco Espirito Santo, S.A.</u> v. <u>Concessionaria Do Rodoanel Oeste S.A.</u>, 100 A.D.3d 100, 106, 951 N.Y.S.2d 19, 24 (1st Dep't 2012); <u>China Privatization Fund (Del), L.P.</u> v. <u>Galaxy Entm't Grp. Ltd.</u>, 95 A.D.3d 769, 770, 945 N.Y.S.2d 659, 760 (1st Dep't 2012); <u>Angelino</u> v. <u>Freedus</u>, 69 A.D.3d 1203, 1206, 893 N.Y.S.2d 668, 671 (3d Dep't 2010) ("'A contract is ambiguous if the language used lacks a definite and precise meaning, and there is a reasonable basis for a difference of opinion.'"); <u>see</u>, <u>e.g.</u>, <u>Bayerische Landesbank</u> v. <u>Aladdin Capital Mgmt. LLC</u>, 692 F.3d at 53;

---

[21/]    (...continued)
writing. [E]xtrinsic and parol evidence is not admissible to create an ambiguity in a written agreement which is complete and clear and unambiguous upon its face." (citations & quotations omitted)); <u>Weissman</u> v. <u>Sinorm Deli, Inc.</u>, 88 N.Y.2d 437, 447, 646 N.Y.S.2d 308, 313 (1996) ("[W]hen parties set down their agreement in a clear, complete document, evidence outside the four corners of the document as to what was actually intended is generally inadmissible.").

[22/]    Accord, <u>e.g.</u>, <u>Bayerische Landesbank</u> v. <u>Aladdin Capital Mgmt. LLC</u>, 692 F.3d at 53; <u>Law Debenture Trust Co.</u> v. <u>Maverick Tube Corp.</u>, 595 F.3d at 467; <u>JA Apparel Corp.</u> v. <u>Abboud</u>, 568 F.3d at 396; <u>Photopaint Techs., LLC</u> v. <u>Smartlens Corp.</u>, 335 F.3d 152, 160 (2d Cir. 2003); <u>RJE</u> v. <u>Northville Indus. Corp.</u>, 329 F.3d 310, 314 (2d Cir. 2003); <u>Nowak</u> v. <u>Ironworkers Local 6 Pension Fund</u>, 81 F.3d 1182, 1192 (2d Cir. 1996); <u>Sayers</u> v. <u>Rochester Tel. Corp. Supplemental Mgmt. Pension Plan</u>, 7 F.3d 1091, 1095 (2d Cir. 1993); <u>Seiden Assocs., Inc.</u> v. <u>ANC Holdings, Inc.</u>, 959 F.2d 425, 428 (2d Cir. 1992); <u>Maniolos</u> v. <u>United States</u>, 741 F. Supp. 2d at 567 (& cases cited therein).

Bison Capital Corp. v. ATP Oil & Gas Corp., 473 F. App'x at 42; JA Apparel Corp. v. Abboud, 568

F.3d at 396-97; Walk-In Med. Ctrs., Inc. v. Breuer Capital Corp., 818 F.2d 260, 263 (2d Cir. 1987)

("An ambiguous word or phrase is one capable of more than one meaning when viewed objectively

by a reasonably intelligent person who has examined the context of the entire integrated agreement

and who is cognizant of the customs, practices, usages and terminology as generally understood in

the particular trade or business." (quotations omitted)); Health-Chem Corp. v. Baker, 737 F. Supp.

770, 773 (S.D.N.Y. Feb. 26, 1990), aff'd, 915 F.2d 805 (2d Cir. 1990).[23/]

        Clear contractual language does not become ambiguous simply because the parties

to the litigation argue different interpretations. E.g., Bethlehem Steel Co. v. Turner Constr. Co., 2

N.Y.2d 456, 460, 161 N.Y.S.2d 90, 93 (1957) ("Mere assertion by one that contract language means

something to him, where it is otherwise clear, unequivocal and understandable when read in

connection with the whole contract, is not in and of itself enough to raise a triable issue of fact.");

Slattery Skanska Inc. v. Am. Home Assurance Co., 67 A.D.3d 1, 14, 885 N.Y.S.2d 264, 274 (1st

Dep't 2009) ("That one party to the agreement may attach a particular, subjective meaning to a term

that differs from the term's plain meaning does not render the term ambiguous."); Moore v. Kopel,

237 A.D.2d 124, 125, 653 N.Y.S.2d 927, 929 (1st Dep't 1997) ("[A] contract is not rendered

---

[23/]     See also, e.g., Law Debenture Trust Co. v. Maverick Tube Corp., 595 F.3d at 466; Parks
Real Estate Purchasing Grp. v. St. Paul Fire & Marine Ins. Co., 472 F.3d 33, 42 (2d Cir.
2006); United Air Lines, Inc. v. Ins. Co. of the State of Pa., 439 F.3d 128, 134 (2d Cir. 2006)
(A contract "is ambiguous when it is reasonably susceptible to more than one reading."
(quotations omitted)); Seiden Assocs., Inc. v. ANC Holdings, Inc., 959 F.2d at 428;
Maniolos v. United States, 741 F. Supp. 2d at 568 (& cases cited therein); Am. Express Bank
Ltd. v. Uniroyal, Inc., 164 A.D.2d 275, 277, 562 N.Y.S.2d 613, 614 (1st Dep't 1990) ("A
contract should be construed so as to give full meaning and effect to all of its provisions."),
appeal denied, 77 N.Y.2d 807, 569 N.Y.S.2d 611 (1991).

ambiguous just because one of the parties attaches a different, subjective meaning to one of its terms.").[24]

## II.   APPLICATION TO NATIXIS' EXPERT

### A.   Natixis' Expert's Qualifications

In seeking to exclude DiYanni's expert report, MBIA argues that "DiYanni does not have sufficient expertise to offer an opinion regarding future RMBS cash flows as of the Early Termination Date."  (Dkt. No. 97: MBIA Br. at 20.)  While Dr. Niculescu and DiYanni "generally agree on the assumptions that should be used in estimating future cash flows from the types of debt instruments in the Asset Portfolio," they do not agree on the "assumptions that should be used with respect to RMBS."  (MBIA Br. at 20; compare Dkt. No. 97: Biron 7/2/12 Aff. Ex. 3: Niculescu Am. Report at 34-35, and Biron 7/2/12 Aff. Ex. 5: Niculescu Reply Report at 8-11; with Biron 7/2/12 Aff. Ex. 8: DiYanni Report at 43-56.)   As further evidence of DiYanni's lack of specialized knowledge regarding RMBS, MBIA asserts that DiYanni inappropriately relied on two colleagues

---

[24]    See, e.g., Law Debenture Trust Co. v. Maverick Tube Corp., 595 F.3d at 467; JA Apparel Corp. v. Abboud, 568 F.3d at 396; Aetna Cas. & Sur. Co. v. Aniero Concrete Co., 404 F.3d 566, 598 (2d Cir. 2005) ("[T]he language of a contract is not made ambiguous simply because the parties urge different interpretations.  Nor does ambiguity exist where one party's view strain[s] the contract language beyond its reasonable and ordinary meaning." (quotations omitted)); Photopaint Techs., LLC v. Smartlens Corp., 335 F.3d at 160 ("Unambiguous contract language is not rendered ambiguous by competing interpretations of it urged in litigation."); see also, e.g., Metro. Life Ins. Co. v. RJR Nabisco, Inc., 906 F.2d 884, 889 (2d Cir. 1990) ("Language whose meaning is otherwise plain is not ambiguous merely because the parties urge different interpretations in the litigation."); Maniolos v. United States, 741 F. Supp. 2d at 569 (& cases cited therein); Petrello v. White, No. 01-CV-3082, 2010 WL 2346303 at *3 (E.D.N.Y. June 9, 2010) ("That the parties and the expert have reached differing conclusions as to the plain meaning of the language does not render the language ambiguous.").

for the RMBS assumptions. (MBIA Br. at 21; <u>see</u> Biron 7/2/12 Aff. Ex. 10: DiYanni Dep. at 271-72.)

Natixis responds that "DiYanni has extensive experience with estimating future cash flows from RMBS" and "[i]t is entirely appropriate for Mr. DiYanni to rely on his colleagues." (Dkt. No. 100: Natixis Opp. Br. at 28-29.)

The Court agrees that DiYanni has sufficient experience in dealing with RMBS to offer an opinion regarding future RMBS cash flows as it relates to the Early Termination Payment. While working at J.P. Morgan and Citigroup, "DiYanni structured synthetic RMBS transactions, priced RMBS, and supervised the determination of assumptions used to determine the cash flows from RMBS." (<u>See</u> page 9 above.) DiYanni also advised a client "'on substantially all of [the client's] credit default swap portfolio,' which included RMBS." (<u>See</u> page 9 above.) DiYanni appropriately relied on the data and research of his colleagues with respect to the RMBS assumptions, as he explained:

> In this case, I relied on the assistance of two of my colleagues at Moelis, Peijie Shiu and Landon Parsons, to gather and review data, propose, in consultation with me, assumptions about the likely future behavior of the RMBS assets in the Solstice II Portfolio, and, once I agreed that the assumptions were reasonable, model the cashflows from those assets based on those assumptions. I supervised their work and I reviewed, and had final authority over, all assumptions used to estimate the net present value of future payments under the Cashflow Swap Agreement.

(Dkt. No. 100: DiYanni Aff. ¶ 7; <u>see also</u> Biron 7/2/12 Aff. Ex. 10: DiYanni Dep. at 272; Natixis Opp. Br. at 28.)

An expert is permitted to rely on assistance from others who work with him. <u>See,</u> <u>e.g.,</u> <u>Bd. of Trs. of AFTRA Ret. Fund</u> v. <u>JPMorgan Chase Bank, N.A.,</u> 09 Civ. 0686, 2011 WL 6288415 at *10 (S.D.N.Y. Dec. 15, 2011) ("Despite plaintiffs' characterizations, the work done by

[third-party economic research and consulting firm hired by defendant], a firm with which [defendant's expert] is affiliated, falls within the permissible scope of research and data collection done by third-party assistants to experts. The [consulting firm] gathered data and provided research under [defendant's expert's] supervision. [Defendant's expert] testified that she used the [consulting firm] to gather data because of the subscriptions they have—'so under my supervision and describing to them what I wanted and needed, they certainly provided me with that data.' . . . There is nothing improper about an expert relying on third-parties for data collection." (fns. omitted)); see also, e.g., Gussack Realty Co. v. Xerox Corp., 224 F.3d 85, 94-95 (2d Cir. 2000) ("[A]n expert may rely on data that she did not personally collect. The Federal Rules of Evidence specifically provide that an expert may rely on facts or data 'perceived by or made known to the expert at or before the hearing.' The expert need not have conducted her own tests." (citation omitted)); Northbrook NY, LLC v. Lewis & Clinch, Inc., No. 09-CV-0792, 2012 WL 4338740 at *6 (N.D.N.Y. Sept. 20, 2012) ("Second, generally, extrapolation is an acceptable method that . . . experts . . . use in making their conclusions. In addition, although Plaintiff argues to the contrary, the data from which an expert extrapolates need not be collected by the expert in order to be credible." (citations & fn. omitted)); Cedar Petrochemicals, Inc. v. Dongbu Hannong Chem. Co., 769 F. Supp. 2d 269, 284 (S.D.N.Y. 2011) (finding expert opinion to be based on sufficient data where "experts have based their conclusions on reliable results from tests conducted by independent consultants and observed by representatives of numerous interested parties" ); Astra Aktiebolag v. Andrx Pharm., Inc., 222 F. Supp. 2d 423, 491 (S.D.N.Y. 2002) (Motion to strike portions of expert's testimony and report are denied because "[p]ursuant to Rule 703, an expert may rely on any facts or data 'of a type reasonably

relied upon by experts in the particular field,' including facts, data, and opinions that are otherwise inadmissible. There is no requirement that an expert must run his own tests.").[25]

Given DiYanni's educational and professional experience, the dearth of legal authority regarding the calculation of termination payments, the fact that the Court is the trier of fact, and the broad discretion of the trial judge in the admission and exclusion of expert evidence, DiYanni's testimony will not be excluded on the basis that he does not have sufficient specialized knowledge involving RMBS cash flows.

**B.     Model A Termination Payment Calculation**

In Model A, DiYanni assumed "that Natixis would be required to advance funds to Solstice II to make up for interest shortfalls to the Class A and B Notes, and also that Solstice II would be required to repay those advances with interest and to pay Natixis its fee," i.e., that the Issuer would be obligated to make payments to Natixis on certain future Distribution Dates even if the Interest and Principal Proceeds were not available to do so under the Priority of Payments. (Dkt. No. 100: Natixis Opp. Br. at 11-12.) Natixis asserts that "the availability of sufficient Principal and Interest Proceeds on any given Distribution Date is a condition precedent to Solstice II making a payment on a specific date, the satisfaction of which should be assumed for purposes of calculating a Termination Payment." (Natixis Opp. Br. at 16, citation omitted.) Natixis argues that the "phrase 'provided that' in a contract signifies that what precedes that phrase is conditioned on the occurrence

---

[25]     Cf. In re Williams Sec. Litig., 496 F. Supp. 2d 1195, 1245 (N.D. Okla. 2007) ("The short of the matter is that [the expert], though clearly possessing the general qualifications required to perform a discounted cash flow analysis, does not possess the industry-specific expertise necessary to make the numerous judgments which had to be made in order to generate the inputs for a discounted cash flow analysis as applied to the dark fiber and related assets . . . ."), aff'd, 558 F.3d 1130 (10th Cir. 2009).

of a future event." (Natixis Opp. Br. at 17, citing cases.) Because the "Reimbursement Payments"

clauses of the Confirmation use the phrase "provided . . . that" (Dkt. No. 97: Biron 7/2/12 Aff. Ex.

6: Confirmation at 2-4), Natixis asserts that the "availability of funds to pay Natixis is therefore a

condition precedent to Solstice II's having to pay Natixis on any particular Distribution Date."

(Natixis Opp. Br. at 18.)

MBIA contends that DiYanni's Model A calculation should be excluded because the

underlying assumption – that the Issuer would make payments to Natixis even if Interest and

Principal proceeds were not available – contradicts both Judge Batts' summary judgment Order and

the Confirmation. (Dkt. No. 97: MBIA Br. at 17; see also Dkt. No. 104: MBIA Reply Br. at 4-8;

Dkt. No. 110: MBIA Surreply Br. at 1-2.)[26] MBIA maintains that "Natixis' strained construction

is untenable." (MBIA Reply Br. at 5, emphasis omitted.)

"As a general rule, it must clearly appear from the agreement itself that the parties

intended a provision to operate as a condition precedent. If the language is in any way ambiguous,

the law does not favor a construction which creates a condition precedent." Kass v. Kass, 235

A.D.2d 150, 159, 663 N.Y.S.2d 581, 588 (2d Dep't 1997) (citations omitted), aff'd 91 N.Y.2d 554,

673 N.Y.S.2d 350 (1998).[27]

---

[26]   In Model A and C, DiYanni valued the CSA through May 2018 and May 2020, not May 2038. (See Biron 7/2/12 Aff. Ex. 8: DiYanni Report.) The Court will address the valuation end dates in Section II.D.

[27]   See, e.g., Edelman Arts, Inc. v. Art Int'l (UK) Ltd., 841 F. Supp. 2d 810, 825 (S.D.N.Y. 2012); Novick v. Metro. Life. Ins. Co., 764 F. Supp. 2d 653, 666 (S.D.N.Y. 2011); Houbigant, Inc. v. IMG Fragrance Brands, LLC, 09 Civ. 0839, 2009 WL 5102791 at *2 (S.D.N.Y. Dec. 18, 2009); Torres v. D'Alesso, 80 A.D.3d 46, 57-58, 910 N.Y.S.2d 1, 10 (1st Dep't 2010); Ashkenazi v. Kent S. Assocs., LLC, 51 A.D.3d 611, 612, 857 N.Y.S.2d 693, 694 (2d Dep't 2008).

In the Summary Judgment Order, Judge Batts concluded that:

> [W]hen calculating the "economic equivalent" of payments required after the Termination Date, <u>Natixis was required to assume satisfaction of the condition precedent that no Early Termination Date had been effectively designated, and that the obligations between Natixis and the Issuer would continue as set forth in the Confirmation</u>.  Similarly, the definition of "Loss" requires calculation of both losses and gains, including from "loss of bargain."  The ISDA Master Agreement thus specifically requires inclusion of future, contingent obligations when calculating the required Early Termination Payment.
>
> . . . Natixis' obligation under the Confirmation of the Cashflow Swap Agreement to make payments to cover the interest shortfalls on the Class A and B Notes was in force.  Natixis was therefore required to take this obligation into account when calculating the Termination Payment.

(<u>See</u> page 8 above, emphasis added.)  The Confirmation reads:

> For each Distribution Date, the sum of (a) the portion of the amount distributable on such Distribution Date pursuant to Section 11.1(a)(i)(G) of the Indenture in respect of Class A Payment Amounts <u>plus</u> interest thereon which shall accrue at a rate per annum (calculated using an Actual/360 Day Count Fraction) equal to the Swap Interest Rate, but in each case only to the extent that such amounts have not previously been reimbursed by Party B <u>plus</u> (b) the Class A Cashflow Swap Fee for such Distribution Date; <u>provided</u> in each case that distributions will only be made in respect of the Class A Reimbursement Payment to the extent that Interest Proceeds or Principal Proceeds are available in accordance with the Priority of Payments to make such distributions on such Distribution Date.

(Biron 7/2/12 Aff. Ex. 6: Confirmation at 3.)<u>28/</u>

Natixis' strained construction that the Issuer's Reimbursement Payment is a condition precedent is unconvincing.  The relevant conditions precedent are in § 2(a) of the Master Agreement.  Section 2(a)(iii) of the Master Agreement provides:

> Each obligation of each party under Section 2(a)(i) is subject to (1) <u>the condition precedent that</u> no Event of Default or Potential Event of Default with respect to the

---

<u>28/</u>  The "Class B Reimbursement Payment" clause is nearly identical to the "Class A Reimbursement Payment" clause above.  (<u>See</u> Biron 7/2/12 Aff. Ex. 6: Confirmation at 4.)  Thus, the Court will only refer to the Class A Reimbursement clause.

other party has occurred and is continuing, (2) <u>the condition precedent that</u> no Early Termination Date in respect of the relevant Transaction has occurred or been effectively designated and (3) each other applicable condition precedent specified in this Agreement.

(Dkt. No. 100: Dugan 7/30/12 Aff. Ex. 4: Master Agmt. § 2(a)(iii), emphasis added.) The conditions precedent are explicitly identified in the Master Agreement as conditions precedent, <u>e.g.</u>, "the condition precedent that."[29/]  While § 2(a)(iii)(3) provides for the possibility of other conditions precedent, there are no other conditions precedent "specified."[30/]

The Court will not read a condition precedent into a contract where it is not clear that the parties intended to create such a condition.  <u>See, e.g.</u>, <u>Israel</u> v. <u>Chabra</u>, 537 F.3d 86, 93 (2d Cir. 2008) ("New York courts are cautious when interpreting a contractual clause as a condition precedent, and they will 'interpret doubtful language as embodying a promise or constructive condition rather than an express condition,' . . . ."); <u>Sciascia</u> v. <u>Rochdale Vill., Inc.</u>, 851 F. Supp. 2d 460, 477-78 (E.D.N.Y. 2012) ("To conclude, absent from the 2005 CBA, relevant side letters, [memorandum of agreement], and 2008 CBA are any terms or phrases even suggesting the possibility of a condition precedent to the Defendant's contribution obligations, let alone language 'clearly imposing' such a condition.").[31/]

---

[29/]  <u>See also</u> Dkt. No. 104: Sogol 8/20/12 Aff. Ex. 3: Anthony C. Gooch & Linda B. Klein, <u>Documentation for Derivatives: Annotated Sample Agreements & Confirmations for Swaps & Other Over-the-Counter Transactions</u> 801 (4th ed. 2002) ("The parties' payment or delivery obligations under this provision are subject to the conditions precedent specified in Section 2(a)(iii), as the parties may have modified them.").

[30/]  Specify is defined as "[t]o state explicitly."  <u>The Am. Heritage Dictionary of the English Language</u> 1240 (1978); <u>see also</u> <u>Black's Law Dictionary</u> 1528 (9th ed. 2009) ("<u>specific</u> . . . Of, relating to, or designating a particular or defined thing; explicit").

[31/]  <u>See also, e.g.</u>, <u>CIH Int'l Holdings, LLC</u> v. <u>BT U.S., LLC</u>, 821 F. Supp. 2d 604, 610-11
(continued...)

Moreover, Judge Batts held that "[p]ayments under Section 2(a)(i) and the Confirmation, however, are subject to the condition precedent set forth in Section 2(a)(iii)," (Dkt. No. 84: 3/28/12 Order at 13), thus, identifying the specific conditions precedent that Natixis must account for in its Termination Payment calculation. Judge Batts further held that "Natixis was required to assume . . . that the obligations between Natixis and the Issuer would continue as set forth in the Confirmation" (see page 8 above), and the Confirmation clearly states that the Issuer will only make reimbursement payments "to the extent that Interest Proceeds or Principal Proceeds are available in accordance with the Priority of Payments" (see page 27 above). The purpose of the CSA was for Natixis to make payments when the Issuer did not have the available funds to do so. To assume that the Issuer would make payments to Natixis when such funds were not available is contrary to the terms of the agreements and not a valid assumption to use to value the Termination Payment.

---

31/ (...continued)
(S.D.N.Y. 2011) (Because there was "no clear language making prompt notice a condition precedent," there was "no basis for the Court to imply a condition given the clear, plain meaning of the language in the notice provision."); Novick v. Metro. Life. Ins. Co., 764 F. Supp. 2d at 668 ("The Court's conclusion that the [contract language] is ambiguous and that therefore no condition precedent may be read into it is especially certain considering the logical implications of . . . defendants' position."); Houbigant, Inc. v. IMG Fragrance Brands, LLC, 2009 WL 5102791 at *3 ("Here, nothing in the language of the Agreement unambiguously suggests that the right of first refusal is a condition precedent to [defendant's] production and sale of trademarked products during the Relevant Period."); Burry v. Madison Park Owner LLC, 84 A.D.3d 699, 700, 924 N.Y.S.2d 77, 78 (1st Dep't 2011) ("Defendant's argument that paragraph 14 creates a condition precedent to plaintiffs' election of the remedy of cancellation is untenable and wholly unsupported by its plain language."); Ashkenazi v. Kent S. Assocs., LLC, 51 A.D.3d at 612, 857 N.Y.S.2d at 694 (refusing to construe language as a condition precedent where there was "nothing contained within the language of the purchase agreements at issue to support the plaintiff's argument that the 30-day provision was meant to be a condition precedent").

Accordingly, DiYanni's Model A Termination Payment calculation is excluded because it rests on the faulty assumption that the Issuer would be required to pay Reimbursement Payments even when there were no Interest and Principle Proceeds available in accordance with the Priority of Payments.

**C.**     **Model B Termination Payment Calculation**

In Model B, DiYanni assumed that:

> MBIA waived the October 26, 2009 Event of Default <u>but did not and/or could not waive</u> additional Events of Default that occurred after October 26, 2009, but on or prior to November 9, 2009, which resulted in additional Cashflow Swap Cancellation Events that were ongoing on November 9. Therefore, Mr. DiYanni assumed, consistent with the Confirmation, that as of November 9, 2009, Natixis' future payment obligations were set to zero, but Solstice II's obligations to reimburse unpaid amounts that were outstanding as of November 9 with interest, and to continue to pay the Cashflow Swap fee were still in place.

(Dkt. No. 100: Natixis Opp. Br. at 13, citation omitted.) Natixis asserts that there was another § 5.1(j) EOD on November 2, 2009, "the next Measurement Date under the Indenture, [because] the overcollateralization ratio again was below 101 percent," and a § 5.1(a) EOD on November 9, 2009, when "Solstice II did not pay interest owed to the Class A and Class B Noteholders." (Dkt. No. 97: Biron 7/2/12 Aff. Ex. 8: DiYanni Report at 33-35; Natixis Supp. Letter Br. at 5-6.)

MBIA contends that there was no separate § 5.1(j) EOD on November 2, 2009, only a continuation of the October 26, 2009 EOD. (Dkt. No. 115: MBIA Supp. Opp. Br. at 23-25.) MBIA asserts that there was no § 5.1(a) EOD on November 9, 2009, because a § 5.1(a) EOD occurs upon "'a default in the payment of interest . . . <u>in each case which default continues for a period of three Business Days</u>'" and the required three Business Days had not run. (MBIA Supp. Opp. Br. at 27.)

The Indenture states that a § 5.1(j) EOD occurs if "the Class A Overcollateralization Ratio on any Measurement Date is less than 101%." (Biron 7/2/12 Aff. Ex. 2: Indenture § 5.1(j).) Where the Class A Overcollateralization Ratio is less than 101% on two subsequent Measurement Dates, the Indenture does not make clear whether that is a continuation of the prior EOD or constitutes an additional EOD. The Indenture distinguishes between the "occurrence" and "continuation" of an EOD (see Biron 7/2/12 Aff. Ex. 2: Indenture § 5.1 ("that an Event of Default shall have occurred and be continuing"), § 5.2(a) ("If an Event of Default occurs and is continuing"), § 5.3 ("If an Event of Default occurs and is continuing"), § 5.4(a) ("If an Event of Default shall have occurred and be continuing"), § 5.5(a) ("If an Event of Default shall have occurred and be continuing")), as well as between the "cure" and "waiver" of an EOD (see Biron 7/2/12 Aff. Ex. 2: Indenture § 6.2 ("unless such Default shall have been cured or waived"), § 13.1(a)-(e) ("If any Event of Default has not been cured or waived"), § 15.1 ("as such Event of Default is cured or waived")).

"In interpreting a contract under New York law, 'words and phrases . . . should be given their plain meaning,' and the contract 'should be construed so as to give full meaning and effect to all of its provisions.'" LaSalle Bank Nat'l Ass'n v. Nomura Asset Capital Corp., 424 F.3d 195, 206 (2d Cir. 2005).[32] "[A]n interpretation of a contract that has the effect of rendering at least one clause superfluous or meaningless . . . is not preferred and will be avoided if possible." LaSalle

---

[32] See, e.g., ReliaStar Life Ins. Co. of N.Y. v. EMC Nat'l Life Co., 564 F.3d 81, 88 (2d Cir. 2009); First Am. Int'l Bank v. Community's Bank, 10 Civ. 3775, 2012 WL 4341740 at *6 (S.D.N.Y. Sept. 21, 2012); Lorterdan Props. at Ramapo I, LLC v. Watchtower Bible & Tract Soc'y of N.Y., Inc., 11 Civ. 3656, 2012 WL 2873648 at *12 (S.D.N.Y. July 10, 2012); USI Ins. Servs. LLC v. Miner, 801 F. Supp. 2d 175, 184 (S.D.N.Y. 2011); Oracle Real Estate Holdings I LLC v. Adrian Holdings Co. I, LLC, 582 F. Supp. 2d 616, 627 (S.D.N.Y. 2008).

Bank Nat'l Ass'n v. Nomura Asset Capital Corp., 424 F.3d at 206 (quotations omitted).[33] In order

to give effect to each word, upon the occurrence of an EOD, the EOD must continue until it is cured

or waived. Cure is defined as "[t]o remove legal defects or correct legal errors." Black's Law

Dictionary 439 (9th ed. 2009). The October 26, 2009 § 5.1(j) EOD would continue until it was

cured (i.e., the Overcollateralization Ratio was above 101%) or waived. Because the

Overcollateralization Ratio did not go above 101% by November 2, 2009, the October 26, 2009

§ 5.1(j) EOD was not cured, nor was it waived. Thus, the October 26, 2009 § 5.1(j) EOD was

continuing on November 2, 2009. This interpretation is also consistent with the actions of the

Trustee, who did not provide Notice of Event of Default on November 2, 2009 as would be required

under the Indenture. (See Biron 7/2/12 Aff. Ex. 2: Indenture § 6.2 ("Promptly (and in no event later

than two Business Days) after the occurrence of any Default . . . , the Trustee shall mail to . . . the

Class A-1 Note controlling party . . . , [and] the Cashflow Swap Counterparty . . . notice of all

Defaults hereunder known to the Trustee, unless such Default shall have been cured or waived.").)

A § 5.1(a) EOD occurs upon "a default in the payment of any interest . . . in each case

which default continues for a period of three Business Days." (Biron 7/2/12 Aff. Ex. 2: Indenture

§ 5.1(a).) While a default in the payment of interest did occur on November 9, 2009, a § 5.1(a) EOD

would not have occurred unless and until the default in the payment of interest continued for three

Business Days. Thus, there was no § 5.1(a) EOD on November 9, 2009.

---

[33] See, e.g., Lorterdan Props. at Ramapo I, LLC v. Watchtower Bible & Tract Soc'y of N.Y., Inc., 2012 WL 2873648 at *12; MBIA Ins. Corp. v. Patriarch Partners VIII, LLC, 842 F. Supp. 2d 682, 706 (S.D.N.Y. 2012); USI Ins. Servs. LLC v. Miner, 801 F. Supp. 2d at 184; Oracle Real Estate Holdings I LLC v. Adrian Holdings Co. I, LLC, 582 F. Supp. 2d at 627.

Moreover, MBIA correctly asserts that DiYanni's assumption for Model B that "<u>a Cashflow Swap Cancellation Event was continuing on Early Termination Date</u>" is contrary to Judge Batts Order.  (Dkt. No. 97: MBIA Br. at 18; <u>see</u> Dkt. No. 84: 3/28/12 Order at 17 (No "Cashflow Swap Cancellation Event was continuing on" the Early Termination Date.).)

"Where the record indicates . . . that [the expert's] analysis rests on faulty assumptions, the trial court has discretion to exclude his proffered testimony for lack of probative value."  (<u>See</u> cases cited on page 17 & n.16 above.)  DiYanni's Model B Termination Payment calculation must be excluded because it rests on the faulty assumption that there was an EOD continuing on November 9, 2009.  <u>See, e.g.</u>, <u>Lightfoot</u> v. <u>Union Carbide Corp.</u>, No. 98-7166, 175 F.3d 1008 (table), 1999 WL 110424 at *2 (2d Cir. Mar. 1, 1999) (expert testimony was properly excluded where it was only relevant to previously rejected claims, "Where the record indicates that the expert failed to consider necessary factors or that his analysis rests on faulty assumptions, the trial court has discretion to exclude his proffered testimony for lack of probative value."), <u>cert. denied</u>, 528 U.S. 817, 120 S. Ct. 56 (1999); <u>Boucher</u> v. <u>U.S. Suzuki Motor Corp.</u>, 73 F.3d 18, 22 (2d Cir. 1996) ("We hold therefore that the district court abused its discretion in permitting [the expert] to testify regarding [plaintiff's] past and future lost earnings capacity based on the unrealistic and speculative assumption that [plaintiff] would have been employed on a permanent, full-time basis, year in and year out, had he not been injured."); <u>Buckley</u> v. <u>Deloitte & Touche USA LLP</u>, 06 Civ. 3291, --- F. Supp. 2d ----, 2012 WL 3538733 at *7 (S.D.N.Y. Aug. 16, 2012) (expert report excluded because it relied "on unfounded assumptions about what [plaintiff] and lenders would have done if certain hypothetical events took place"); <u>Supply & Bldg. Co.</u> v. <u>Estee Lauder Int'l, Inc.</u>, 95 Civ. 8136, 2001 WL 1602976 at *5 (S.D.N.Y. Dec. 14, 2001) (expert report excluded because expert

"based his report on his client's unrealistic assurances rather than available records" and "client's guarantees were not reliable and were contradicted by other data available"); <u>Johnson Elec. N. Am. Inc.</u> v. <u>Mabuchi Motor Am. Corp.</u>, 103 F. Supp. 2d 268, 284 (S.D.N.Y. 2000) (excluding expert opinion where it relied on faulty assumptions).

Accordingly, DiYanni's Model B Termination Payment calculation is excluded because it rests on a faulty assumption.

**D.      Model C Termination Payment Calculation**

In Model C, DiYanni assumed that "Natixis must include in its calculation Natixis' future contingent payments but only those future payments that Solstice II could make until its assets stopped generating cash sufficient to meet its payment obligations." (Dkt. No. 100: Natixis Opp. Br. at 13.)   Thus, DiYanni valued the CSA through May 2018 (when the last meaningful reimbursement payment from Solstice would be received) and alternatively through May 2020 (when the remaining principal payments to be received by the Issuer would be less than $1 million). (Dkt. No. 97: Biron 7/2/12 Aff. Ex. 8: DiYanni Report at 38-42.)   Natixis argues that this assumption is in accordance with Judge Batts' Order because she ordered that the parties must account for future contingent payments through the "scheduled end," not through "2038." (Dkt. No. 108: Natixis Surreply Br. at 3.)   "[T]he Notes may cease to be Outstanding if they are canceled, which, in turn, could happen for a variety of reasons, including the liquidation of the Solstice II SPV." (Natixis Opp. Br. at 21, citation omitted; <u>see</u> Biron 7/2/12 Aff. Ex. 2: Indenture § 1.1.) DiYanni opined "that it would be commercially reasonable to assume that the Swap would terminate in May 2018, after which point Solstice II would have <u>de minimis</u> collateral-generated cash flows, and would be unable to make the payments required by the Indenture 'waterfall.'" (Natixis Opp. Br.

at 21.) Natixis further asserts that MBIA's own expert Dr. Niculescu "opined that it would be commercially reasonable to assume that the Cashflow Swap Agreement would terminate, not in May 2038, but when the assets remaining in Solstice II were 'de minimis.'" (Natixis Opp. Br. at 22; see Biron 7/2/12 Aff. Ex. 3: Niculescu Am. Report at 5, 25; Biron 7/2/12 Aff. Ex. 4: Niculescu Supp. Report at 2.)[34/]

MBIA contends that DiYanni incorrectly valued "the Cashflow Swap through May 2018 and May 2020" (Dkt. No. 97: MBIA Br. at 19-20, emphasis omitted; Dkt. No. 104: MBIA Reply Br. at 10-12; Dkt. No. 110: MBIA Surreply Br. at 2), and "DiYanni's opinion on [his understanding of the Cash Flow Swap] is irrelevant because the Court has determined that the Cashflow Swap Agreement unambiguously requires that the calculation of the Termination Payment

---

[34/]

Q    So is it your opinion that it's appropriate to consider cash flows only until 2023?

A    Yes, that is, I think, one very reasonable date that one can consider. There may be other dates, but I thought that was one very reasonable date.

Q    And why is 2023 a reasonable date in your view?

A    At that point, the projections show that there will be only one million dollars of principal balance left outstanding on the assets that underlie the Solstice II transaction. That strikes as a de minimis number.

As you go on in time, there is a persistent tail of principal balances that remain outstanding for very many years, very close to or up until the legal final, depending on your assumptions. But those projected principal balances, clearly never more than one million dollars and for many yeas drop down to a few hundred thousand or a few tens of thousands of dollars, those sums struck me as minimal. And, therefore, I was asked to make the assumption, which I thought was a reasonable assumption, that the valuation should be cut off at the time that the projected principal balance declined below a million dollars.

(Dkt. No. 100: Dugan 7/30/12 Aff. Ex. 6: Niculescu Dep. at 173-74.)

account for the value of the Cashflow Swap through its scheduled end" (MBIA Br. at 20). MBIA asserts that the CSA's "scheduled end" is when the Class A and B Notes "'cease to be Outstanding'" pursuant to the Confirmation, and the Class A and B Notes will cease to be outstanding at either their scheduled maturity in May 2038 or when they are paid off in full. (MBIA Br. at 9; see also Biron 7/2/12 Aff. Ex. 2: Indenture § 1.1 (definition of "Outstanding" at 42), § 2.2(b); Biron 7/2/12 Aff. Ex. 6: Confirmation at 2-4.) Because Dr. Niculescu projected that the Class A and B Notes would not be paid off until their scheduled maturity in May 2038 (Biron 7/2/12 Aff. Ex. 3: Niculescu Am. Report at 22), MBIA asserts that the scheduled end of the CSA would be May 2038 (MBIA Br. at 11). MBIA disputes that the Notes may be canceled if the Asset Portfolio is liquidated. (MBIA Reply Br. at 11, citing Biron 7/2/12 Aff. Ex. 2: Indenture §§ 2.4(g), 2.8, 2A.4(b)(x), 2A.4(h), 2A8.)[35/]

In Dr. Niculescu's Amended and Supplemental Reports, MBIA "instructed [him] to assume and [he has] assumed that the claim will end when the principal balance outstanding of non-defaulted and currently paying securities reaches a $1 million threshold." (See page 12 above.) Dr. Niculescu stated:

> I am of the opinion that, should the Cashflow Swap stay in operation through the life of the Transaction, Natixis would be called upon to make significant unreimbursed payments to the Issuer beginning in May 2015. Those payments are projected to total $43.6 million by November 2023, at which time the projections show that the Issuer would have no underlying assets and therefore no possible further interest or principal collections*. The present value of the payments projected to be made to the Issuer under the Cashflow Swap through 2023 varies from $13.0 to $22.2 million depending on the discount rate assumption used.

---

[35/]    See MBIA Reply Br. at 11 ("Indeed, the liquidation of the Asset Portfolio is an Additional Termination Event under the Agreement -- meaning that, upon liquidation, the Cashflow Swap could be terminated and a termination payment would need to be calculated valuing the swap through its scheduled end.").

    \*    As noted below, it is also possible that further payments could be required from the Cashflow Swap until the legal final maturity of Solstice II in 2038 and that such sums could be in excess of $100 million.

(See pages 12-13 above, fn. in original.) As recently as April 12, 2012, MBIA requested that the Court rely on the expert reports previously submitted by the parties in connection with the summary judgment motions (see Dkt. No. 106: 4/12/12 Conf. Tr. at 5), thus, relying on the 2023 calculations in Dr. Niculescu's Amended and Supplemental Reports (see pages 12-13 above).[36] Dr. Niculescu did not actively put forth a Termination Payment calculation valuing the parties' obligations through May 2038 (and discounted back to its value on November 9, 2009) until his Reply Report submitted in response to DiYanni's Report. (Biron 7/2/12 Aff. Ex. 5: Niculescu Reply Report at 4.) Dr. Niculescu's Reply Report still included two calculations valuing the parties obligations through 2023 and 2038. (Biron 7/2/12 Aff. Ex. 5: Niculescu Reply Report at 4.)

       The Court can hardly find that the assumption underlying DiYanni's Model C Termination Payment calculation – i.e., the "scheduled end" of the CSA when Solstice's assets were de minimis – is faulty or unreasonable when it uses a similar assumption for May 2018 and the very same assumption for May 2020 that MBIA's expert Dr. Niculescu used in his Termination Payment calculations. Accordingly, DiYanni's Model C Termination Payment calculation is admissible.

       The Court will now determine whether to utilize DiYanni's Model C Termination Payment calculation or Dr. Niculescu's Termination Payment calculation.

---

[36]     While Dr. Niculescu did include an alternate calculation for 2038 in his Amended and Supplemental Reports, the future cash flows were not discounted back to their value on November 9, 2009. (See pages 12-13 above; see also Biron 7/2/12 Aff. Ex. 3: Niculescu Am. Report at 25 ("Any additional payments beyond 2023 would also need to be similarly discounted to find a present value."); Dugan 7/30/12 Aff. Ex. 6: Niculescu Dep. at 170-73.)

## III.    THE TERMINATION PAYMENT

The Termination Payment calculations that survived the motion in limine are Natixis' DiYanni Model C Termination Payment calculations of $2,259,785 and $10,538,773 due from Natixis to the Issuer when valued through May 2018 and May 2020, respectively, and MBIA's Dr. Niculescu calculations of $19,187,364 or $47,059,041 due from Natixis to the Issuer with end dates of November 2023 or May 2038, respectively. (See pages 12, 13 n.6 above.)[37]

Natixis claims that as the Non-Affected Party in relation to the Additional Termination Event it is "the sole determining party for purposes of calculating a Termination Payment" and "its Termination Payment should be affirmed if it is reasonable and offered in good faith." (Dkt. No. 100: Natixis Opp. Br. at 14.) Natixis asserts that "MBIA's proposed Termination Payment is contrary to . . . the Cashflow Swap Agreement, [and] is based on flawed assumptions," i.e., "the incorrect assumptions that Natixis had not properly terminated the Cashflow Swap Agreement, that Natixis was the defaulting party, and that Solstice II was therefore the determining party for purposes of calculating the Termination Payment." (Natixis Opp. Br. at 23, 24.)

MBIA contends that the Non-Affected Party is not the only party who can calculate the Termination Payment, Dr. Niculescu did not assume that Natixis was the Defaulting Party, and Dr. Niculescu's 2038 Termination Payment calculation is reasonable and should be adopted. (Dkt. No. 97: MBIA Br. at 11; Dkt. No. 104: MBIA Reply Br. at 12-15.)

---

[37] Because the Termination Payment for the CSA must be calculated as of November 9, 2009, and the Rabobank Hedge Agreement was not terminated until November 30, 2009 (see page 8 above; Dkt. No. 84: 3/28/12 Order at 21), one must assume that the Rabobank Hedge Agreement has not been terminated for the purposes of the Termination Payment calculation. Thus, the Court will only use Dr. Niculescu's calculations assuming that the Rabobank Hedge Agreement had not terminated.

Pursuant to Part 1(j)(2) of the Schedule, Natixis is the Non-Affected Party in connection with the Additional Termination Event.  (See Dkt. No. 100: Dugan 7/30/12 Aff. Ex. 4: Master Agmt. § 5(b)(v) ("If any 'Additional Termination Event' is specified in the Schedule or any Confirmation as applying, the occurrence of such event (and, in such event, the Affected Party or Affected Parties shall be as specified for such Additional Termination Event in the Schedule or such Confirmation)."); Dugan 7/30/12 Aff. Ex. 5: Schedule Part 1(j)(2) ("Party B [Solstice] will be the sole Affected Party in connection with this Additional Termination Event.").)  For purposes of calculating an Early Termination Payment, Affected Party is synonymous with Defaulting Party, and Non-Affected Party is synonymous with Non-Defaulting Party.  (See Dugan 7/30/12 Aff. Ex. 4: Master Agmt. § 6(e)(ii)(1) ("references to the Defaulting Party and to the Non-defaulting Party will be deemed to be references to the Affected Party and the party which is not the Affected Party, respectively").)  The Non-Affected Party should calculate the Termination Payment.  (See Dugan 7/30/12 Aff. Ex. 9: Anthony C. Gooch & Linda B. Klein, Documentation for Derivatives: Annotated Sample Agreements & Confirmations for Swaps & Other Over-the-Counter Transactions 90 (3d ed. 1993) ("When there is only one Affected Party, the justification for allowing only the non-Affected Party to calculate the Settlement Amount is that a considerable distortion could occur if the Affected Party did the calculation . . . .").)

Dr. Niculescu, however, testified at his deposition that he performed his calculations with the assumption that Natixis was the Defaulting Party.  (See Dugan 7/30/12 Aff. Ex. 6:

Niculescu Dep. at 80 ("[M]y understanding for the purposes of doing my analysis is that MBIA

maintains that Natixis is the defaulting party.").)[38]  But Dr. Niculescu's Reply Report stated:

> My calculations were completed from Natixis' perspective as demonstrated by the
> discount rate assumptions that I made.  Moreover, other than the appropriate discount
> rate, I do not believe the identity of the 'sole affected party' has an effect on my
> calculation of the termination payment in this instance, which is solely based on
> discounted projected cash flows.

(Dkt. No. 97: Biron 7/2/12 Aff. Ex. 5: Niculescu Reply Report at 11-12; see also Dkt. No. 104:

Niculescu Aff. ¶¶ 6-8 (stating that he "assumed that Natixis was the determining party").)  It is not

clear what assumptions Dr. Niculescu made with respect to who was the Non-Affected Party and

who was the Affected Party, and how such assumptions affected his Termination Payment

calculations.

In further support of its calculations, Natixis asserts that the CSA was designed to

provide only liquidity enhancement to the interest payments, not credit protection.  (Natixis Opp.

Br. at 12; Natixis Supp. Letter Br. at 2-4; Dkt. No. 116: Natixis Supp. Reply Br. at 3-5; see also

Biron 7/2/12 Aff. Ex. 8: DiYanni Report at 9-10, 28-30; Biron 7/2/12 Aff. Ex. 10: DiYanni Dep. at

---

[38]      Q      And you are also assuming that Natixis is the defaulting party, correct?

          A      That is correct.

          Q      Which would make Solstice II the non-defaulting party, correct?

          A      That is correct.

          Q      And under the documentation it would be Solstice II who would also be the
                 determining party that would have to calculate its loss?

          A      That is correct.

(See also Dugan 7/30/12 Aff. Ex. 6: Niculescu Dep. at 117-18.)

140-43.)  Natixis relies on internal MBIA documents where the term "liquidity" was used (see Natixis Supp. Letter Br. at 2-4, citing Dugan 11/19/12 Aff. & Exhibits thereto), as well as the CSA Fee of 0.065% (Biron 7/2/12 Aff. Ex. 8: DiYanni Report at 10, 41; Biron 7/2/12 Aff. Ex. 10: DiYanni Dep. at 142-49).

Even if the Court were to look to extrinsic evidence to determine whether the CSA was only a liquidity enhancement vehicle or also a credit enhancement vehicle, the evidence that Natixis relies on is not dispositive.  With respect to the internal MBIA documents that use the term liquidity, Natixis selectively quoted helpful language and omitted language that would support credit enhancement.  (See Dkt. No. 115: MBIA Supp. Opp. Br. at 13, citing Dugan 11/19/12 Aff. & Exhibits thereto.)  Indeed, in context, it is clear that the focus was on liquidity because the credit issue was viewed at the time as basically risk free – until later, when the market collapsed.

With respect to the fee level associated with the CSA,  DiYanni stated that the "fee level associated with the Cash-flow Swap (0.065% per annum) is further evidence . . . that the role envisioned for the Cash-flow Swap provider was limited to liquidity provision." (Biron 7/2/12 Aff. Ex. 8: DiYanni Report at 10, 41.)  DiYanni later testified that the fee would be approximately 0.215% for liquidity and credit support of the interest payments, and approximately 0.453% for credit protection to both interest and principal. (Biron 7/2/12 Aff. Ex. 10: DiYanni Dep. at 145-47.) While it is clear that the CSA provided liquidity enhancement to the interest and the MBIA Swap provided credit protection to the principal, it is disputed as to who provided credit protection to the interest.  The MBIA Swap Fee was 0.085%, nowhere near the fee levels put forth by DiYanni for credit protection.  (See page 4 above.)  Moreover, the MBIA Swap Fee (0.085%) is relatively similar to the CSA Fee (0.065%), as are the actual fees received through November 2009.  (See pages 3, 4

above.)  The extrinsic evidence Natixis relies on hardly establishes that the purpose of the CSA was to provide only liquidity support to the interest.

The key difference between DiYanni's Model C and Dr. Niculescu's calculation is the assumption of when the Cash Flow Swap would end.  (See, e.g., MBIA Reply Br. at 10-11 ("The difference between Dr. Niculescu's calculation and Mr. DiYanni's Model C calculation is driven by the following different assumptions:  (i) Dr. Niculescu valued the Cashflow Swap through its scheduled end which, based on his projection, is May 2038, and (ii) Mr. DiYanni incorrectly failed to value the Cashflow Swap through its scheduled end . . . .").)  The Court, however, rejects MBIA's assumption that the Early Termination Payment must be valued through May 2038, the legal maturity of the Notes.  While Judge Batts held that "Natixis was required to account for the value of the Cash Flow Swap through its scheduled end" (see page 8 above), she did not hold that it must be valued through May 2038 or the Notes' legal maturity.  MBIA asserts that the CSA's scheduled end is when the Notes "'cease to be Outstanding,'" and the Notes will cease to be outstanding at their legal maturity in May 2038 or when they are paid off in full.  (See page 36 above.)  Natixis contends that the "Notes may cease to be Outstanding if they are canceled, which, in turn, could happen for a variety of reasons, including the liquidation of the Solstice."  (See page 34 above.)  Natixis cites a trade article stating that "nearly 80 percent of the CDOs that defaulted in the last five years either liquidated or accelerated payments to senior bondholders, which would result in the notes ceasing to be outstanding well before their respective final maturity dates."  (Natixis Opp. Br. at 21 n.16, citing Dugan 7/30/12 Aff. Ex. 10: Heavier Lifting Ahead for Liquidations of CDO Portfolios, Asset-Backed Alert (Mar. 16, 2012).)

Moreover, both DiYanni and Dr. Niculescu opined that it would be commercially reasonable to assume that the Swap would terminate when Solstice would have de minimis cash flows. (Compare Biron 7/2/12 Aff. Ex. 3: Niculescu Am. Report at 3 ("In making projections of future cash flows, various assumptions were made that I believe to be reasonable about future performance of assets and about the functioning of Solstice II."), Biron 7/2/12 Aff. Ex. 4: Niculescu Supp. Report at 2 ("In my earlier report, I proposed that Solstice II would reasonably end when all possible future cash had been received from the securities that underlay the structure and I projected that to happen in May 2023."), and Dugan 7/30/12 Aff. Ex. 6: Niculescu Dep. at 173-74 ("Yes, that is, I think, one very reasonable date [i.e., 2023] that one can consider. There may be other dates, but I thought that was one very reasonable date. . . . At that point, the projections show that there will be only one million dollars of principal balance left outstanding on the assets that underlie the Solstice II transaction. That strikes as a de minimis number. . . . And, therefore, I was asked to make the assumption, which I thought was a reasonable assumption, that the valuation should be cut off at the time that the projected principal balance declined below a million dollars."), with Biron 7/2/12 Aff. Ex. 8: DiYanni Report at 39 ("In my opinion it is not reasonable to expect that the Cash-flow Swap would continue beyond the first date of May 2018 presented below. I have also provided calculations to a second (or alternative) date of May 2020.").)

The Court adopts Natixis' May 2020 Model C Termination Payment calculation, which is very similar to Dr. Niculescu's calculation. Both DiYanni and Dr. Niculescu performed their calculations as of November 9, 2009 (see pages 10, 13 above), used a discount rate of LIBOR +200 bps (see pages 10, 13 above), and assumed that the Rabobank Hedge Agreement had not terminated (see pages 10, 13 n.6 above). In addition, DiYanni and Dr. Niculescu both used an end

date when the principal balance outstanding on non-defaulted and currently paying securities in the Asset Portfolio would be less than $1 million, 2020 and 2023 respectively. (See pages 11-12 above.) While DiYanni's and Dr. Niculescu's calculations vary, the Court adopts DiYanni's calculation because Natixis is the Non-Affected Party.

## CONCLUSION

For the reasons discussed above, the Court finds that a Termination Payment of $10,538,773 is due from Natixis. The Clerk of Court shall enter judgment in coordination with this Opinion and Judge Batts' ruling on the summary judgment motion.

DATED:     New York, New York
           December 20, 2012

**Andrew J. Peck**
United States Magistrate Judge

Copies to:    All Counsel
              Judge Deborah A. Batts